**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RAMONA A. MANUS, | Case No. 08 CV 01037 |
| Plaintiff, | |
| v. | The Honorable Joan H. Lefkow |
| SAGE HOSPITALITY RESOURCES, LLC | Magistrate Judge Arlander Keys |
| Defendant. | **Jury Trial Demanded** |

## FIRST AMENDED COMPLAINT

Plaintiff Ramona A. Manus ("Ms. Manus") by her attorney, sets forth the following as her First Amended Complaint against Defendant Sage Hospitality Resources, LLC ("Defendant"):

### Nature of the Case

1)      In response to Ms. Manus's complaints about being denied shifts and/or hours because of her age and because of her efforts to recover for a work injury, Defendant engaged in an increasingly hostile pattern of discrimination, harassment and retaliation against Ms. Manus that culminated in Ms. Manus's discharge.

2)      Through its unlawful conduct, Defendant denied Ms. Manus the opportunity to do what she has done since becoming a community service officer for the Arlington Heights Police Department in 1979:  work.

3)      Ms. Manus seeks to recover for discrimination, harassment and retaliation in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), and Illinois common law.

<u>**Parties**</u>

4)      Ms. Manus, born in 1932, is a citizen of the United States and the State of Illinois.  She has consistently maintained a residence in the Northern District of Illinois since approximately 1949.

5)      Defendant Sage Hospitality Resources, LLC is a Delaware limited liability company whose principal place of business is located at 1512 Larimer St., Ste. 800, Denver, Colorado 80202.  Defendant's registered service agent in Illinois is C.T. Corporation System, 208 S. LaSalle, Ste. 814, Chicago, Illinois 60604.

6)      In approximately November 2003, Defendant became the owner and operator of the Sheraton Chicago Northwest Hotel, located at 3400 W. Euclid Ave., Arlington Heights, Illinois 60005, where Plaintiff was employed.

7)      Defendant is an "employer" as defined by the ADEA.

8)      Defendant is an "employer" as defined by Illinois common law.

<u>**Background**</u>

9)      Ms. Manus began working at the Sheraton Chicago Northwest hotel located at 3400 Euclid Ave., Arlington Heights, Illinois ("the hotel") on approximately February 13, 2001.

10)      Ms. Manus was employed at the hotel from approximately February 13, 2001, until approximately July 18, 2006, when she was unlawfully terminated by Defendant.

11)    Throughout Ms. Manus's employment at the hotel, she met or exceeded her employers' expectations for performance.  She received numerous awards and commendations for providing high quality customer service.

12)    Additionally, throughout Ms. Manus's employment at the hotel, she maintained a residence at a condominium in Palatine, Illinois – approximately one mile from the hotel.  Although Ms. Manus had a house in Nevada, she lived in Palatine, Illinois, filed income tax returns in Illinois, and was at all times during her employment was a resident of Illinois.

13)    Prior to working for the hotel, Ms. Manus worked for American Airlines from approximately 1989 to approximately 1997.  Ms. Manus worked in service positions the entire time she worked for American Airlines, first as a clerk and then in management as a crew chief.  As a benefit of having worked for American Airlines, Ms. Manus receives special flying privileges enabling her to fly free for life.

14)    Prior to working for American Airlines, Ms. Manus worked for the Arlington Heights Police Department from approximately 1979 to approximately 1997.  Ms. Manus worked as a community service officer for the Police Department and helped protect and serve the citizens of Arlington Heights.

15)    At Arlington Heights Police Department, American Airlines and other places of employment, Ms. Manus received numerous awards and recognition for her customer service.

16)    During Ms. Manus's employment at the hotel, she occasionally would visit her home in Nevada, taking advantage of her flying privileges with American

Airlines.  But Ms. Manus made clear to her supervisors and managers that she was always available to work.

17)    When Ms. Manus began working at the hotel, it was owned by Starwood. In approximately 2002, the hotel was acquired by Merritt Hospitality, LLC.  In approximately November 2003, the hotel was acquired by Defendant.

18)    Throughout most of Ms. Manus's employment at the hotel, the hotel's HR Specialist was Jenny O'Brien.  HR Specialist O'Brien was originally hired by Merritt Hospitality, LLC, but continued to work as Defendant's human resources representative at the hotel after it was acquired by Defendant.  During Ms. Manus's employment with Defendant, HR Specialist O'Brien was responsible for all human resources functions at the hotel (e.g., human resources role in hiring, firing, discipline, compensation, union grievances, etc.).

19)    Initially, Ms. Manus worked as a hostess in the hotel's VIP lounge.  In that position, her job included providing customer service for the hotel's most important customers (arranging for transportation, dinner reservations, activities, etc.).

20)    After the attacks on September 11, 2001, the travel industry suffered and the hotel no longer needed a VIP lounge hostess.

21)    In approximately October 2001, Ms. Manus was transferred to a full-time hostess position at the hotel's restaurant, Delaney Murphy Steakhouse.  At that time, Ms. Manus was within six months of turning seventy years old.  Although Ms. Manus was a full-time employee, there were few hours available for her to work in October and November 2001 because of the downturn in the travel industry.

22)    During the time Ms. Manus worked at the hotel's restaurant, Vicki Lain was the restaurant's Manager.  Throughout Ms. Manus's employment, Restaurant Manager Lain was responsible for scheduling and supervising all of the restaurant's workers (bussers, servers, hostesses, kitchen staff, etc.).  Manager Lain was approximately thirty-three to thirty-five years old when she became Restaurant Manager.

23)    After September 11, 2001, Ms. Manus was the only hostess at the hotel's restaurant.  However, beginning in approximately February or March 2002, Ms. Vesula Makelavich also began working as a hostess at the hotel's restaurant.  Ms. Makelavich also was hired as a full-time employee and was approximately 21 or 22 years old when she began working as a hostess at the hotel restaurant.  Ms. Mikalevah voluntarily resigned from employment at the hotel in approximately 2003, but was rehired by Defendant in approximately July 2006.

24)    In approximately 2003, shortly after Ms. Makelavich resigned, another hostess was hired to work at the hotel's restaurant, Ms. Diana Gonzales.  Ms. Gonzales also was hired as a full-time employee and was approximately 18 or 19 years old when she began working as a hostess at the hotel restaurant.

25)    Ms. Manus was the only hostess who worked at hotel restaurant who was over forty years old.  For the vast majority of the time Ms. Manus worked at the hotel restaurant, she was seventy years old or older.

26)    In approximately early 2005, HR Specialist O'Brien hired Missy Abebaw to work as the restaurant's Assistant Manager.  Assistant Manager Abebaw was

between approximately twenty-seven and thirty-three years old when she became the restaurant's Assistant Manager.

27)    Towards the end of Ms. Manus's employment, Defendant employed Kevin Rabelar as the Food & Beverage Manager. Food & Beverage Manager Rabelar served as Restaurant Manager Lain's supervisor.

28)    Throughout Ms. Manus's employment at the hotel, the hotel also had a General Manager. Towards the end of Ms. Manus's employment, Frank Leone was employed by Defendant as the hotel's General Manager. General Manager Leone was the person who informed Ms. Manus her employment with Defendant was terminated.

## Age Discrimination, Harrassment And Retaliation By Defendant

29)    Pursuant to Defendant's collective bargaining agreement, Ms. Manus was entitled to receive the first forty hours of work available for any of several positions (including the restaurant hostess position) as a result of her seniority working at the hotel.

30)    Additionally, pursuant to Defendant's collective bargaining agreement, Ms. Manus should have been scheduled at least thirty-two hours per week as a full-time employee.

31)    Rather than assign Ms. Manus the hours and/or shifts to which she was entitled pursuant to the hotel's collective bargaining agreement, the hotel managers denied Ms. Manus hours and/or shifts because of her age.

32)      Specifically, throughout 2002, 2003, 2004, 2005 and 2006, the hotel engaged in a continuing practice of assigning Ms. Makelavich and/or Ms. Gonzales hours and/or shifts that should have been assigned to Ms. Manus.

33)      When Ms. Manus made inquiries about being denied hours and/or shifts, Restaurant Manager Lain and HR Specialist O'Brien repeatedly and falsely informed Ms. Manus that no work was available. In reality, however, hours and/or shifts were assigned to Ms. Makelavich and/or Ms. Gonzalez instead of Ms. Manus.

34)      For example, in approximately February or March 2002, Ms. Manus discussed with Restaurant Manager Lain the fact that Ms. Makelavich (the newly hired hostess), was being given hours instead of Ms. Manus. In response, Restaurant Manager Lain implicitly threatened Ms. Manus's continued employment by proclaiming, "we can hire as many hostesses as we please," or words to that effect. On another occasion shortly thereafter when Ms. Manus raised the issue, Restaurant Manager Lain said "I can hire ten hostesses if I want" or words to that effect.

35)      During one conversation between Ms. Manus and Restaurant Manager Lain in approximately 2002, Ms. Manus mentioned to Restaurant Manager Lain that she could provoke a lawsuit by ignoring union contracts and federal laws and that she intended to raise the matter with the company. In response, Restaurant Manager Lain said she had checked with higher-ups in the company and "the company does not give a shit what you do and neither do I – you'll be dead before you collect anything" or words to that effect.

36)     Ms. Manus filed several grievances with her union challenging Defendant's continuing practice of denying her hours and/or shifts because of her age. None of her grievances were successful.  Rather than remedy the discrimination Ms. Manus was experiencing, HR Specialist O'Brien and Restaurant Manager Lain retaliated against her.

37)     Beginning in approximately 2003, Ms. Manus was subjected to an increasingly hostile pattern of discrimination, harassment and retaliation, as described in this Complaint.  For example, the hotel's managers retaliated against Ms. Manus by, among other things, continuing to deny Ms. Manus hours and/or shifts and treating her differently in other ways.

38)     Additionally, Ms. Manus was subjected to numerous harassing and discriminatory remarks based on her age.  For example, in approximately 2002 or 2003, Restaurant Manager Lain asked Ms. Manus, "why is an old lady like you working?" or words to that effect.  Additionally, in approximately 2003, Restaurant Manager Lain told Ms. Manus, "I won't work when I'm your age," or similar words.

## Ms. Manus's Workers' Compensation Claim

39)     On approximately March 27, 2004, Ms. Manus was injured at work through no fault of her own.  Ms. Manus slipped on avocado dip a server had spilled.

40)     As a result of slipping, Ms. Manus broke bones in her foot, severely twisted her ankle, hurt her knee and tore blood vessels in her leg.  Defendant sent Ms. Manus to the hospital in a taxi-cab instead of an ambulance.

41)    As a result of her injury, Ms. Manus was unable to work from approximately late March 2004 through approximately June 2005.

42)    During the time Ms. Manus was off work, Defendant stopped paying Ms. Manus's health insurance premiums.

43)    Ms. Manus attempted to exercise her right to recover for her work injury under the Illinois Workers' Compensation Act.

44)    Initially, HR Specialist O'Brien refused to submit paperwork identifying Ms. Manus's injury as work-related and/or subject to the Illinois Workers' Compensation Act.

45)    Eventually, Ms. Manus filed a claim for benefits under the Illinois Workers' Compensation Act.  But Defendant refused to authorize payment of Ms. Manus's benefits within the required time period.

46)    Instead, Defendant contested Ms. Manus's medical bills and required her to go to an unlicensed medical care provider (HR Specialist O'Brien even made appointments for Ms. Manus with this unlicensed doctor without consulting Ms. Manus first).  The courses of treatment recommended by the physician Ms. O'Brien chose lengthened the time it took Ms. Manus to heal and return to work.

47)    Ms. Manus ultimately resolved her claim for benefits under the Illinois Workers' Compensation Act with Defendant in approximately early 2006.

48)    HR Specialist O'Brien also refused to submit paperwork identifying other employees' injuries as work-related.  Instead, she would require injured employees to

49)     As a result of Ms. Manus exercising her rights under the Illinois Workers' Compensation Act, Defendant incurred additional financial costs and had to complete additional administrative tasks, including substantial paperwork.

50)     Additionally, as a result of Defendant contesting Ms. Manus's claim for benefits under the Illinois Workers' Compensation Act, Ms. Manus incurred expenses and attorneys fees.

51)     Upon information and belief, individuals who worked at Defendant's corporate headquarters in Denver were aware of Ms. Manus's attempts to recover benefits for her workplace injury under the Illinois Workers' Compensation Act.

**Continuing Age Discrimination, Harassment And Retaliation**

52)     When Ms. Manus returned to work after her work injury, Ms. Manus continued to assert her workplace rights – including her right to be free from age discrimination.  In response, Defendant continued its previous, ongoing pattern of discrimination, retaliation and harassment against Ms. Manus.

53)     Specifically, Defendant continued to deny Ms. Manus hours and/or shifts and, instead, assign them to the busperson (who Ms. Manus trained) and Ms. Gonzales. This practice continued from when Ms. Manus returned from her work injury leave until her termination of employment.

54)    Ms. Manus again filed grievances with her union challenging Defendant's

ongoing practice of denying her hours and/or shifts because of her age. But Ms. Manus

continued to experience age discrimination, harassment and retaliation.

55)    For example, during the week beginning on Monday, February 26, 2006,

Ms. Gonzales was scheduled to work 33 hours, but Ms. Manus was only scheduled to

work 25 hours.

56)    Additionally, Ms. Manus continued to hear discriminatory references to

her age, as she had before her injury. For example, in approximately 2005, Ms. Abebaw

told Ms. Manus, "I know I'm not gonna be working when I'm 70 years old," or words to

that effect. These comments were typical of many Ms. Manus frequently heard from

Defendants managers throughout her employment, including from HR Specialist

O'Brien and Restaurant Manager Lain. Ms. Manus found these and similar remarks

abusive and insulting. Fellow employees were often sympathetic with Ms. Manus and

asked her how she could tolerate such abuse and harassment.

57)    Like other managers, Assistant Manager Abebaw also threatened Ms.

Manus with termination. Specifically, Assistant Manager Abebaw mentioned she was

hired by Sage as a "headhunter" during a conversation with Ms. Manus and others

employees in approximately 2005 (near the time Assistant Manager Abebaw was hired).

Ms. Manus understood Ms. Manus to mean that she was hired to fire specific

individuals. During the conversation, Assistant Manager Abebaw bragged that she

could fire anybody if she wanted that person fired. She said she would "write" about

the employee, and keep writing, and finally turn the employee into management. She

bragged she could do this even if the employee did nothing wrong and laughed about how she had fired two employees in a previous job this way.

58)     In an attempt to coerce Ms. Manus into quitting, Restaurant Manager Lain and/or Assistant Manager Abebaw scheduled Ms. Manus to work fourteen days in a row, but still did not schedule her for enough hours to enable to her to be eligible for health insurance benefits (32 hours/week).  Other workers were not scheduled to work as many days in a row.

59)     As time passed, the discrimination, harassment and retaliation Ms. Manus experienced grew more severe.  For example, Defendant continued to subject Ms. Manus to differential treatment through the form of abuse, swearing and inappropriate remarks based on her age.  Ms. Manus was not aware of other employees being treated similarly.

60)     Specifically, Defendant's managers also repeatedly swore at Ms. Manus, particularly when she questioned any of her managers about being denied hours or being assigned additional work responsibilities.  For example, Restaurant Manager Lain repeatedly would tell Ms. Manus to "get her old ass out" of her office.  This happened on many occasions, including when Ms. Manus went to discuss work issues with Restaurant Manager Lain (e.g., after doing a wine inventory in approximately 2005).

61)     Aware of Ms. Manus's previous complaints of age discrimination, Food & Beverage Manager Rabelar (Restaurant Manager Lain's direct supervisor), attempted to intimidate Ms. Manus the very first day he met her in approximately November 2005. Specifically, Mr. Rabelar threatened Ms. Manus by telling her "I've been hired by this

company as a headhunter" and "I am the god damn manager of this hotel and I will run

this god damn hotel any way I choose" and "you are not the boss here – do you

understand what I am trying to tell you?," or words to that effect.  Ms. Manus

understood Mr. Rabelar to mean he was hired to fire certain people – and specifically

Ms. Manus.  Ms. Manus told Mr. Rabelar he was "out of line" and insisted on having a

union representative present for any discipline (as she understood was her right).

62)    Ms. Manus also was excluded from informal gatherings between

employees and managers at the restaurant and subjected to different working

conditions because of her age.  For example, many employees would take breaks during

their shifts and would eat complimentary meals prepared by the kitchen staff

specifically for them (e.g., steak, chicken, shrimp, fish, etc.).  Often times, restaurant

management (including General Manager Leone and Food & Beverage Manager

Rabelar) would eat with employees during these important socializing opportunities

during which restaurant business was discussed.

63)    Ms. Manus rarely if ever was afforded breaks during her shifts, was not

offered complimentary meals by the kitchen staff, and was not offered the opportunity

to dine with restaurant management and discuss restaurant business in such an

informal atmosphere.

64)    As another form of discrimination, harassment and retaliation, Restaurant

Manager Lain would interfere with Ms. Manus's ability to answer phone reservations –

either by redirecting phones to different areas of the hotel or arranging for "fake"

reservations calls.  For example, on approximately March 15, 2006, Ms. Manus

answered approximately 15 prank phone calls.

65)    Additionally, Restaurant Manager Lain and Assistant Manager Abebaw

repeatedly arranged for their friends to dine at the restaurant for free based on false

complaints against Ms. Manus.

66)    Ms. Manus also continued to experience threats of termination.  For

example, at one point, in approximately March 2006, Ms. Manus was informed by hotel

management that she could lose her job because she was not working enough hours.

After hearing this, Ms. Manus met with her union president, Leo Panatsis, who

informed her that she was a full-time employee.  When Ms. Manus asked HR Specialist

O'Brien to check her records about this issue at a grievance meeting in approximately

March 2006, HR Specialist O'Brien told Ms. Manus "all of your records were lost," or

words to that effect.  This was the second time HR Specialist O'Brien told Ms. Manus

records that should have been in her personnel file were lost.

67)    As another threat, on approximately March 13, 2006, Restaurant Manager

Lain warned Ms. Manus that she could be fired if she "badged in early," or words to

that effect.  Shortly thereafter, Restaurant Manager Lain warned Ms. Manus that she

could be fired if she "badged in late," or words to that effect.  Other employees who

swiped their badges a little early or a little late (effectively reporting to work and

"clocking in") were not disciplined or threatened with discipline in the same way as Ms.

Manus.

68)    Defendant also discriminated against Ms. Manus by requiring her to perform extra job duties when she was scheduled to work.  Specifically, Ms. Manus was frequently required to perform the duties of the bus-person (clearing tables, setting up tables, etc.).  For example, on an evening in mid-March 2006, Ms. Manus was required to perform hostess and bussing duties for approximately 106 tables.  Ms. Manus was assigned these (and other) responsibilities despite the fact that her only duties were to "meet, greet and seat" restaurant patrons.

69)    Ms. Manus thought Defendant was harassing her and retaliating against her in a designed effort to get her to quit.  She had numerous conversations about this and the way in which she was treated with her coworkers and managers.

70)    In the summer of 2006, Defendant rehired Ms. Makelavich as a hostess at the hotel's restaurant.  Restaurant Manager Lain flaunted Ms. Makelavich's hiring to Ms. Manus in approximately June 2006.

71)    Additionally, around June or July 2006, HR Specialist O'Brien also informed Ms. Manus that the restaurant "had plenty of work," or words to that effect and that Ms. Makelavich might be coming back to work.  Defendant, however, continued to be deny Ms. Manus hours and/or shifts.

72)    Additionally, Ms. Manus was asked to assist Assistant Manager Abebaw in falsifying information regarding a customer's injury in the restaurant on approximately July 13, 2006.  Shortly after a customer wearing cowboy boots slipped on recently polished floors, Assistant Manager Abebaw approached Ms. Manus and stated the customer was intoxicated.  Ms. Manus, who greeted and seated the customer, told

Assistant Manager Abebaw that the customer did not seem or smell intoxicated. Assistant Manager Abebaw became furious and demanded that Ms. Manus go find out his name and room number.

73)    Ms. Manus was left with no options:  she could not assist her supervisor in falsifying records without risking termination, and she could not disobey her supervisor without risking termination.

74)    Later that evening, Assistant Manager Abebaw called Ms. Manus back to her office.  Only Assistant Manager Abebaw, Ms. Manus and "Nash" (the Chef) were present.   In front of Nash, Assistant Manager Abebaw told Ms. Manus "I don't like your attitude" or words to that effect.  In response, Ms. Manus objected to being asked to falsely document the patron's injury.  Ms. Manus said it was making her sick and she needed to go home.  In response, Assistant Manager Abebaw became angry and twice told Ms. Manus to "get your old ass out of here," or words to that effect, yelling and waiving her hands as if to shoo Ms. Manus away dismissively.

## Ms. Manus's Termination

75)    On approximately July 18 – less than a week after Assistant Manager Abebaw told Ms. Manus to get her "old ass" out of her office – Ms. Manus arrived at work before her shift was scheduled to start.  Initially, General Manager Leone (the hotel's most senior on-site manager) asked if he could meet with Ms. Manus.  She mentioned she was not on the clock and that she needed to go to the doctor and would not be reporting to work that day.

76)    Almost simultaneously, HR Specialist O'Brien and Food & Beverage

Manager Rabelar approached General Manager Leone.  At this point, Ms. Manus

suspected she was about to be fired.  Mr. Leone mentioned that a union representative

was present, but Ms. Manus indicated that she wanted to have a different union

representative present and asked to meet the next day.

77)    General Manager Leone told Ms. Manus that she did not need to return to

work because her employment was terminated.  General Manager Leone also

threatened Ms. Manus with arrest if she stepped foot on the hotel's property after her

termination.

78)    Ms. Manus attempted to challenge her termination by filing a grievance

with her union.  She was not notified of the grievance meeting by the union or

Defendant.  When she did not appear at her grievance meeting, Defendant declined to

reschedule the meeting.

79)    Additionally, HR Specialist O'Brien wrote a memorandum that falsified

events (as if to "paper the file").  Specifically, HR Specialist O'Brien wrote in a

memorandum dated August 4, 006, that Ms. Manus called her union representative on

the day the grievance was scheduled to cancel the appointment.  Ms. Manus never

called her union representative to cancel the grievance meeting because she was never

informed when that meeting would take place.

80)    Individuals who worked at Defendant's corporate headquarters in Denver

were aware of Ms. Manus's complaints of age discrimination prior to her termination of

employment.  Ms. Manus sent letters to Defendant's corporate headquarters describing

the discrimination and retaliation she was experiencing repeatedly throughout her employment.

81)     Defendant failed to take steps designed to remedy or correct Defendant's discriminatory, harassing and retaliatory practices in response to Ms. Manus's repeated complaints about age discrimination.  Instead, Defendant continued unlawfully discriminating against, harassing and retaliating against Ms. Manus by discharging her.

82)     After Ms. Manus's termination of employment, Defendant's managers continued discriminating against, harassing and retaliating against her by contesting her claim for unemployment benefits through false statements that she was "disrespectful to a supervisor."  Despite Defendant's attempts, Ms. Manus was able to obtain unemployment compensation benefits.

83)     Ms. Manus believes that shortly after her termination, Defendant scheduled both Ms. Makelavich and Ms. Gonzales with enough hours to obtain health insurance benefits (32 hours/week).

84)     The restaurant did employ two servers older than forty years of age (Judy Richter and Rosie Mandolini).  To Ms. Manus's knowledge, Ms. Richter and Ms. Mandolini never complained about discriminatory treatment because of their age and never attempted to recover for a work injury under the Illinois Workers' Compensation Act during their employment with Defendant.

## Jurisdiction and Venue

85)    Ms. Manus alleges claims against Defendant under the Age

Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), and

Illinois common law.

86)    This Court has jurisdiction over Ms. Manus's ADEA claims pursuant to 28

U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 626(b).

87)    This Court has supplemental jurisdiction of Ms. Manus's Illinois common

law claims pursuant to 28 U.S.C. § 1367(a).

88)    Venue is proper in this judicial district under 29 U.S.C. § 1392(b)(2)

because the alleged unlawful conduct occurred in this judicial district.

## Exhaustion Of Administrative Filing Requirement

89)    Ms. Manus filed an EEOC charge against Defendant on March 28, 2007.  A

copy of Ms. Manus's EEOC charge is attached as Exhibit A.

90)    The EEOC issued a Notice of Right to Sue on November 21, 2007.  Ms.

Manus did not receive the copy of the Notice of Right to Sue sent to her via certified

mail.

91)    Thus, the EEOC mailed Ms. Manus another copy the previously issued

Notice of Right to Sue on December 18, 2007.  Ms. Manus received this copy at some

point after December 25, 2007.  A copy of the Notice of Right to Sue that Ms. Manus

received and the attached cover letter is attached as Exhibit B.

92)    Ms. Manus filed her original *pro se* Complaint on February 20, 2008, within

ninety days of receiving the Notice of Right to Sue.

**Defendant's Conduct Constitutes A Continuing Violation**

93)    The discrimination Ms. Manus experienced continued from approximately 2002 until after she was terminated and the harassment and retaliation Ms. Manus experienced continued from approximately 2003 until after she was terminated.  Defendant's unlawful pattern of harassment, discrimination and retaliation was comprised of a series of connected acts and events, each of which alone may not have constituted a violation of the ADEA.

94)    The unlawful employment practices Ms. Manus challenges (other than the termination of her employment) constitute continuing unlawful employment practices and not discrete acts.

**Ms. Manus Suffered Injury As A Result Of Defendant's Conduct**

95)    As a result of Defendant's unlawful conduct, Ms. Manus was denied equal employment opportunities because of her age, because she opposed age discrimination and/or because she sought to exercise her rights to recover for a workplace injury.

96)    Additionally, as a result of being denied hours and/or shifts, Ms. Manus became ineligible for health insurance benefits and also lost pension contributions.

97)    Further, as a result of Defendant's unlawful conduct, Ms. Manus also lost past and future wages and other benefits.  She also suffered embarrassment, humiliation, loss of dignity, and her career was irreparably damaged as a result of Defendant's unlawful conduct.

98)    As a result of Defendant's unlawful conduct, Ms. Manus also incurred expenses, including but not limited to attorneys' fees and costs.

## COUNT I
### Discrimination In Violation Of The ADEA – Denial of Hours/Shifts

99)      Ms. Manus repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

100)     By denying Ms. Manus hours and/or shifts because of her age, Defendant discriminated against her with respect to terms, conditions and privileges of employment in violation of 29 U.S.C. § 623(a)(1).

101)     By denying Ms. Manus hours and/or shifts because of her age, Defendant limited, segregated or classified her in a way that deprived her or tended to deprive her of employment opportunities in violation of 29 U.S.C. § 623(a)(2).

102)     By denying Ms. Manus hours and/or shifts because of her age, Defendant limited, segregated or classified her in way that adversely affected her status as an employee in violation of 29 U.S.C. § 623(a)(2).

103)     Ms. Manus's age was a motivating factor in Defendant's conduct towards her, including Defendant's managers' decisions to deny Ms. Manus hours and/or shifts.

104)     As a result of Defendant's actions, Ms. Manus sustained lost past and future wages and benefits, damage to her career, emotional distress (including, without limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

105)     The actions of Defendant were intentional and/or done maliciously or with reckless indifference to Ms. Manus's rights.

WHEREFORE, Ms. Manus requests all available monetary and equitable relief necessary to effectuate the purpose of the ADEA consistent with the harm Defendant caused Ms. Manus.

## COUNT II
## <u>Discrimination In Violation Of The ADEA - Discharge</u>

106)    Ms. Manus repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

107)    By discharging Ms. Manus because of her age, Defendant discriminated against her with respect to terms, conditions and privileges of employment in violation of 29 U.S.C. § 623(a)(1).

108)    By discharging Ms. Manus because of her age, Defendant limited, segregated or classified her in a way that deprived her or tended to deprive her of employment opportunities in violation of 29 U.S.C. § 623(a)(2).

109)    By discharging Ms. Manus because of her age, Defendant limited, segregated or classified her in way that adversely affected her status as an employee in violation of 29 U.S.C. § 623(a)(2).

110)    Ms. Manus's age was a motivating factor in Defendant's conduct towards her, including Defendant's managers' decision to engage in conduct which led to Ms. Manus's discharge and/or Defendant's managers' decision to discharge Ms. Manus.

111)    As a result of Defendant's actions, Ms. Manus sustained lost past and future wages and benefits, damage to her career, emotional distress (including, without

limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

112)    The actions of Defendant were intentional and/or done maliciously or with reckless indifference to Ms. Manus's rights.

WHEREFORE, Ms. Manus requests all available monetary and equitable relief necessary to effectuate the purpose of the ADEA consistent with the harm Defendant caused Ms. Manus.

### COUNT III
### Harassing Conduct In Violation Of The ADEA

113)    Ms. Manus repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

114)    By engaging in harassing conduct towards Ms. Manus because of her age, Defendant discriminated against her with respect to terms, conditions and privileges of employment in violation of 29 U.S.C. § 623(a)(1).

115)    By engaging in harassing conduct towards Ms. Manus because of her age, Defendant limited, segregated or classified her in a way that deprived her or tended to deprive her of employment opportunities in violation of 29 U.S.C. § 623(a)(2).

116)    By engaging in harassing conduct towards Ms. Manus because of her age, Defendant limited, segregated or classified her in way that adversely affected her status as an employee in violation of 29 U.S.C. § 623(a)(2).

117)    Ms. Manus's age was a motivating factor in Defendant's conduct towards her, including Defendant's managers' decisions to engage in harassing conduct towards her.

118)    Defendant's harassing conduct towards Ms. Manus created a hostile work environment in violation of the 29 U.S.C. § 623(a)(1).

119)    As a result of Defendant's actions, Ms. Manus sustained lost past and future wages and benefits, damage to her career, emotional distress (including, without limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

120)    The actions of Defendant were intentional and/or done maliciously or with reckless indifference to Ms. Manus's rights.

WHEREFORE, Ms. Manus requests all available monetary and equitable relief necessary to effectuate the purpose of the ADEA consistent with the harm Defendant caused Ms. Manus.

## Count IV
## Retaliation In Violation Of The ADEA

121)    Ms. Manus repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

122)    On several occasions, Ms. Manus reported to Defendant practices which she believed to be unlawful because they were discriminatory based on her age.

123)    By reporting to Defendant practices which she believed to be unlawful because they were discriminatory based on her age, Ms. Manus engaged in conduct protected by the ADEA.

124)    By denying Ms. Manus hours and/or shifts because she engaged in protected activity, Defendant discriminated against her in violation of 29 U.S.C. § 623(d).

125)    By discharging Ms. because she engaged in protected activity, Defendant discriminated against her in violation of 29 U.S.C. § 623(d).

126)    By engaging in harassing conduct towards Ms. Manus because she engaged in protected activity, Defendant discriminated against her in violation of 29 U.S.C. § 623(d).

127)    Ms. Manus's protected activities were a motivating factor in Defendant's conduct towards her, including Defendant's managers' decisions to deny her hours and/or shifts, to engage in conduct which led to Ms. Manus's discharge, to discharge her, and to engage in harassing conduct towards her.

128)    As a result of Defendant's actions, Ms. Manus sustained lost past and future wages and benefits, damage to her career, emotional distress (including, without limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

129)    The actions of the Defendant were intentional and/or done maliciously or with reckless indifference to the rights of the Ms. Manus.

WHEREFORE, Ms. Manus requests all available monetary and equitable relief necessary to effectuate the purpose of the ADEA consistent with the harm Defendant caused Ms. Manus.

## Count V
## Retaliatory Termination In Violation Of Illinois Common Law

130)    Ms. Manus repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

131)    Illinois public policy requires that employees be free from retaliation for attempting to exercise their rights to recover for work injuries under the Illinois Workers' Compensation Act.

132)    Ms. Manus's attempt to exercise her rights under the Illinois Workers' Compensation Act was a motivating factor in Defendant's decision to discharge her.

133)    As a result of the actions of the Defendant, as set forth above, Ms. Manus sustained lost past and future wages and benefits, damage to her career, emotional distress (including, without limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

134)    The actions of the Defendant were intentional and/or done maliciously or with reckless indifference to the rights of the Ms. Manus.

WHEREFORE, Ms. Manus requests all available monetary and equitable relief consistent with the harm Defendant caused Ms. Manus.

**<u>Relief Sought – All Counts</u>**

135)    Ms. Manus repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

136)    The Court has the power to award any legal or equitable relief that will effectuate the purpose of the ADEA.

137)    This Court also has the power to award any common law contractual and/or tort remedies available under Illinois common law.

WHEREFORE, Ms. Manus respectfully requests that the Court enter an order declaring that Defendant's conduct violated 29 U.S.C. § 623 (and, therefore, 29 U.S.C. § 215), and directing that Defendant:

a)  Conduct training for all managers at the hotel regarding age discrimination, harassment, retaliation, Defendant's policy regarding age discrimination, Defendant's policy regarding harassment, Defendant's policy regarding retaliation, and Defendant's reporting procedures for age discrimination, harassment and retaliation (pursuant to 29 U.S.C. § 626(c)(1));

b)  Conduct training regarding how to prevent  bias (including stereotypes) from impeding employment opportunities for older workers (pursuant to 29 U.S.C. § 626(c)(1));

c)  Establish reporting goals and timetables for increasing the number of older workers at the hotel (pursuant to 29 U.S.C. § 626(c)(1));

d)  Adopt policies aimed at preventing and remedying any future ADEA violations that may occur, including an *effective* reporting procedures and *effective* investigation procedures that prevent retaliation (pursuant to 29 U.S.C. § 626(c)(1));

e)  Forbid future violations of the ADEA (pursuant to 29 U.S.C. § 626(c)(1));

f)  Remove managerial and human resources responsibilities from Restaurant Manager Lain, Assistant Manager Abebaw, General Manager Leone, Food &

Beverage Manager Rabelar and HR Specialist O'Brien (pursuant to 29 U.S.C. § 626(c)(1));

g) Notify employees of the violation(s) and the remedy imposed by this Court (pursuant to 29 U.S.C. § 626(c)(1));

h) Pay Ms. Manus all lost past and future wages (including benefits), compensatory damages, liquidated damages and punitive damages (pursuant to 29 U.S.C. §§ 216(b) & (c), 626(b) & (c)(1) and Illinois common law);

i) Pay Ms. Manus for other monetary expenses she incurred as a result of Defendant's conduct (pursuant to 29 U.S.C. §§ 216(b) & (c), 626(b) & (c)(1) and Illinois common law);

j) Reinstatement Ms. Manus (pursuant to 29 U.S.C. §§ 216(b) & (c), 626(b) & (c)(1) and Illinois common law);

k) Pay Ms. Manus pre-judgment interest allowed by law;

l) Pay any available penalties the Court deems appropriate (pursuant to 29 U.S.C. §§ 211(b) or 216 (but not subjection (a));

m) Pay Ms. Manus's attorney fees and costs (including any expert witness fees) (pursuant to 29 U.S.C. §§ 216(b) & (c), 626(b) & (c)(1) &); and,

n) Fulfill any other conditions that the Court deems equitable, just, appropriate or necessary to effectuate the purposes of the ADEA (pursuant o 29 U.S.C. § 626(c)(1)).

## JURY DEMAND

Plaintiff demands a trial by jury of all issues raised in this Complaint.

Respectfully submitted,

_____

J. Bryan Wood

Attorney for Plaintiff

J. Bryan Wood  (No. 6270845)
THE LAW OFFICE OF J. BRYAN WOOD
53 W. Jackson Blvd., Ste. 660
Chicago, Illinois 60604
Telephone:  (312) 545-1420
Facsimile:  (312) 577-0749
Email:  bryan@jbryanwoodlaw.com

Electronically filed on April 30, 2008